### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BRIAN M. NEIMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>T. PAUL BULMAHN, LELAND E. TATE, ALBERT L. REESE, JR., GEORGE R. MORRIS and KEITH R. GODWIN,<br><br>Defendants. | CIVIL ACTION NO.<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Brian M. Neiman ("Plaintiff") individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of ATP Oil & Gas Corporation ("ATP" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports, and information about Defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.       This is a federal securities class action on behalf of purchasers of the common stock of ATP during the period from December 16, 2010 through the Company's bankruptcy filing on August 17, 2012, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

1

2.      ATP is engaged in the acquisition, development, and production of oil and natural gas properties. The Company seeks to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea that are economically attractive, but not strategic to major or large independent exploration-oriented oil and gas companies. The Company also has licenses for exploration in the Mediterranean Sea.

3.      On April 20, 2010, the Deepwater Horizon, a deepwater drilling rig operating in the Outer Continental Shelf in the Gulf of Mexico exploded, burned for two days, and sank, resulting in the largest oil spill in the history of the Gulf of Mexico. As a result of the Deepwater Horizon explosion, on May 6, 2010, the United States Department of the Interior issued a moratorium that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico. This first moratorium was judicially stayed, but the Department of the Interior issued a second moratorium. This second moratorium ended on October 12, 2010, with respect to all deepwater drilling activity in the Gulf of Mexico. These moratoria halted all or most of the Company's operations in the Gulf of Mexico.

4.      On or about October 12, 2010, ATP filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC, indicating its intent to issue 11.875% Senior Second Lien Exchange Notes (the "Notes").    After one amendment on December 14, 2010, the Company filed a Prospectus (the "Prospectus") on December 16, 2010 on Form 424B3, which was declared effective by the SEC on the same day.

5.      Pursuant to the Registration Statement and Prospectus, ATP executed the Exchange, which offered $1.5 billion worth of Notes.

6.      The Registration Statement contained false and misleading statements and/or omissions of material fact, as set forth more completely below.

2

7.     Also as set forth below, the Defendants issued false and misleading statements subsequent to the Registration Statement as well.

8.     On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion. It announced that it was going to continue operating during its financial restructuring using $618 million in debtor-in-possession ("DIP") funding. The bankruptcy case is styled *In re ATP Oil & Gas Corp.,* U.S. Bankruptcy Court for the Southern District of Texas, No. 12-36187 (the "Bankruptcy Action").

9.     As set forth more completely herein, during the course of the Bankruptcy Action, the truth was revealed that ATP had: (1) severely downplayed the impact that the United States Department of Interior moratoria had on the Company's business and revenues; (2) violated the provisions of certain credit agreements to which the Company was a party; (3) issued a Registration Statement that contained false and misleading statements and/or omissions of material fact; and (4) subsequently made materially false and misleading statements regarding the liquidity and financial condition of the Company.

10.     As a result of the false and misleading misstatements and omissions detailed herein, the price of the Company's stock fell from $15.36 at the beginning of the Class Period to $0.30 at the time of the bankruptcy filing.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.110b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     This Court has personal jurisdiction over all Defendants named herein because they conducted business in this District during the Class Period.

14.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendants purposefully availed themselves of the benefits of this District. Many of the acts complained of, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants, occurred, at least in part, in this District.

## PARTIES[1]

15.     Plaintiff Brian M. Neiman purchased the common stock of ATP during the Class Period and was damaged thereby, as set forth in his Certification attached herewith.

16.     Defendant T. Paul Bulmahn ("Bulmahn") was the Chairman and Chief Executive Officer and Director of ATP during the Class Period.

17.     Defendant Leland E. Tate ("Tate") was the President of ATP during the Class Period.

18.     Defendant Albert L. Reese, Jr. ("Reese") was the Chief Financial Officer of ATP during the Class Period.

19.     Defendant George R. Morris ("Morris") was Chief Operating Officer of ATP during the Class Period.

20.     Defendant Keith R. Godwin ("Godwin") was the Chief Accounting Officer of ATP during the Class Period.

---

[1] Due to the Bankruptcy Action, ATP is not a defendant in this action.  The Company is incorporated and headquartered in Houston, Texas.  The Notes trade under the CUSIP number 00208JAE8.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action on behalf of a Class, consisting of all persons who purchased or otherwise acquired the common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are potentially thousands of members in the proposed Class. The proposed Class may be identified from records maintained by ATP or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

5

b.      whether the Registration Statement, Prospectus, documents referenced therein, and subsequent public statements by Defendants on behalf of ATP were materially false or misleading; and

c.      to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.     ATP is a Texas corporation engaged in the acquisition, development, and production of oil and natural gas properties. The Company seeks to acquire and develop properties with proved undeveloped reserves in the Gulf of Mexico and the North Sea that are economically attractive. The Company also has licenses in the Mediterranean Sea.

28.     Throughout the Class Period, Defendants made several misstatements and omissions, as detailed more completely herein. These misrepresentations and omissions had a material, adverse impact on ATP and caused the value of its common stock to decline.

29.     The Defendants in this action are the ATP executives who prepared and signed the Registration Statement, and made additional false and misleading statements subsequent to the Registration Statement.  In violation of the Securities Exchange Act, Defendants are liable for having issued inaccurate and misleading statements and omitting material facts from the Registration Statement that the Company filed with the SEC in support of the Exchange, and

subsequent to the Registration Statement.   All the Defendants knew, or should have known, that the problems discussed herein would seriously impair ATP's business and financial conditions and results.

30.     Specifically, under the applicable SEC rules and regulations governing the preparation of the Registration Statement and the financial statements and subsequent related SEC filings, the Defendants materially misstated and/or failed to adequately disclose the true severity of the problems facing the Company's business operations, revenues and liquidity.

31.     The sale of the Notes was effectuated through a Registration Statement on Form S-4 (File No. 333-169880) declared effective by the SEC on December 16, 2010.

32.     In the Company's Registration Statement released on October 12, 2010, the Company stated:

> On April 20, 2010, a semi-submersible drilling rig operating in the deepwater Outer Continental Shelf ("OCS") in the Gulf of Mexico exploded, burned for two days and sank, resulting in an oil spill in Gulf of Mexico waters. In response to this crisis, the U.S. Department of the Interior ("DOI"), on May 6, 2010, instructed the Minerals Managements Service ("MMS") to stop issuing drilling permits for OCS wells and to suspend existing OCS drilling permits issued after April 20, 2010, until May 28, 2010, when a report on the accident was expected to be completed. On May 28, 2010, DOI issued a moratorium, originally scheduled to last for six months, that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico ("Moratorium I"). On June 7, 2010, a lawsuit was filed by several suppliers of services to Gulf of Mexico exploration and production companies challenging the legality of Moratorium I. This challenge was successful and on June 22, 2010, a Federal District Court issued a preliminary injunction preventing Moratorium I from taking effect. On July 8, 2010, the United States Court of Appeals for the Fifth Circuit denied the DOI's motion to stay the preliminary injunction against the enforcement of Moratorium I. This case is still pending on appeal before the Fifth Circuit as of the date of this prospectus. On July 12, 2010, in response to the Court's actions, the DOI issued a second moratorium ("Moratorium II") scheduled to end on November 30, 2010 that (i) specifically superseded Moratorium I, (ii) suspended all existing operations in the Gulf of Mexico and other regions of the OCS utilizing a subsea blowout preventer ("BOP") or a surface BOP on a floating facility, and (iii) suspended pending and future permits to drill wells involving the use of a subsurface BOP or a surface BOP on a floating facility. Several lawsuits

challenging the legality of Moratorium II were subsequently filed in different Federal District Courts, all of which have been consolidated into one case in a Federal District Court that is still pending as of the date of this prospectus.

While Moratorium II is not scheduled to end before November 30, 2010, we cannot predict with certainty when it will end. In September 2010, the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEM"), successor to the MMS, announced the issuance of a new interim "Drilling Safety Rule" and a new final "Workplace Safety Rule" that impact all operations on the OCS. The interim Drilling Safety Rule codifies an earlier notice to lessees and operators issued by BOEM and requires additional testing, third-party verification, training for rig personnel, and governmental approvals to enhance well bore integrity and the operation of BOPs and other well control equipment used in OCS wells. The final Workplace Safety Rule requires all OCS operators to implement all of the formerly voluntary practices in the American Petroleum Institute's Recommended Practice 75, which includes the development and maintenance of a Safety and Environmental Management System.

33.    The Registration Statement further provided, with respect to the Company's

business operations and revenues:

We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark location and may delay a drilling operation scheduled in 2011 at our Gomez location. During June 2010, we agreed to terminate a contract for services of a drilling rig as a result of Moratorium I. Under the termination agreement, we obtained a full release from our obligations under the contract and incurred net costs of $8.7 million. We are pursuing recovery from BP p.l.c. of these and other direct costs incurred as a result of the accident in the Gulf of Mexico.

We project a substantial increase in production over the next year as development wells are brought to production. Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis. Our ability to execute on our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico. Our plan is currently based upon resuming suspended activities upon the expiration of Moratorium II currently scheduled to occur on November 30, 2010, obtaining necessary drilling permits, and successfully achieving expected commercial production from existing wells presently scheduled for completion during the remainder of 2010 and the first quarter of 2011. Delays in resuming those activities due to circumstances such as an extension of Moratorium II, delays in receiving necessary permits, reduced access to

equipment and services, or weather delays, could have a material adverse effect on our financial position, results of operations and cash flows. In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing various other sources of funding, including bringing partners into our projects, there is no current assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.

Depending on their duration and extent, these developments could have a material adverse affect on our results of operations, cash flows and liquidity.

34.     Also in the Registration Statement, the Company misleadingly stated:

***The unavailability or increased cost of drilling rigs, equipment, supplies, personnel and oilfield services could adversely affect our ability to execute on a timely basis our development plans and abandonment operations within our budget.***

Shortages or an increase in cost of drilling rigs, equipment, supplies or personnel could delay or adversely affect our operations, which could have a material adverse effect on our business, financial condition and results of operations. Increased drilling activity in the Gulf of Mexico and the North Sea decreases the availability of offshore rigs and associated equipment. In periods of increased drilling activity in the Gulf of Mexico and the North Sea, we may experience increases in associated costs, including those related to drilling rigs, equipment, supplies and personnel and the services and products of other vendors to the industry. These costs may increase further and necessary equipment and services may not be available to us at economical prices. For the years ended December 31, 2009, 2008 and 2007, we recorded losses on abandonment of $2.9 million, $13.3 million and $18.6 million, respectively, primarily as a result of unanticipated increases in service costs in the Gulf of Mexico. Redeployment of drilling rigs to areas other than the Gulf of Mexico as the result of Moratorium I and Moratorium II may also be expected to reduce the availability of offshore rigs, particularly those with deepwater capability, thus increasing costs in future years.

(emphasis in original).

35.     Furthermore, with respect to the Company's Credit Agreement and credit facilities, the Registration Statement provided:

On June 18, 2010, the Company entered into a Credit Agreement (the "Credit Agreement") among the Company, Credit Suisse AG ("CS"), as administrative

and collateral agent, and the lenders party thereto, providing for initial term loans of $150 million (the "Term Loans"). Principal outstanding under the Term Loans bears interest at an annual rate of 11.0%. As security for the Company's obligations under the Credit Agreement, the Company granted the lenders a security interest in and a first lien on the collateral described under "Description of Exchange Notes—Security."

* * *

The Company is subject to certain negative covenants under the Credit Agreement. The provisions of the Credit Agreement limit the Company's ability to, among other things:

- incur additional indebtedness;

- pay dividends on the Company's capital stock or purchase, repurchase, redeem, defease or retire the Company's capital stock or subordinated indebtedness;

- make investments;

- incur liens;

- create any consensual restriction on the ability of the Company's restricted subsidiaries to pay dividends, make loans or transfer property to the Company;

- engage in transactions with affiliates;

- sell assets; and

- consolidate, merge or transfer assets.

36.     Also, with respect to the Company's Credit Agreement and credit facilities, the Registration Statement further provided:

These restrictions may make it difficult for us to successfully execute our business strategy or to compete in our industry with companies not similarly restricted.

There can be no assurance that we will remain in compliance with the covenants under our debt agreements.

A breach of any of these covenants could result in a default under our credit facility and/or the notes. Upon the occurrence of an event of default under our senior secured credit facility, the lenders could elect to declare all amounts outstanding under our senior secured credit facility to be immediately due and payable and terminate all commitments to extend further credit. If we were unable

to repay those amounts, the lenders could proceed against the collateral granted to them to secure that indebtedness. We have pledged a significant portion of our assets as collateral under our senior secured credit facility. If the lenders under our senior secured credit facility accelerate the repayment of borrowings, we may not have sufficient assets to repay our credit facility and our other indebtedness, including the notes. See "Description of Senior Indebtedness." Our borrowings under our senior secured credit facility are, and are expected to continue to be, at variable rates of interest and expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same, and our net income would decrease.

37.     The Company released its Prospectus on December 16, 2010. The Prospectus contained identical, or very nearly identical, language to the Registration Statement. The Prospectus did not contain any corrections or additional information that would render the above-quoted language from the Registration Statement complete, accurate, or otherwise not false, inaccurate, and/or misleading.

38.     The statements referenced above in ¶¶32-37 were false or misleading statements of material fact. At the time of the Exchange, Defendants were already aware of the truth regarding its business operations and revenues. Instead of disclosing the truth, Defendants determined to issue false and/or misleading statements and omissions thereon. Moreover, at the time of the Exchange, Defendants were further aware that it had breached certain of the negative covenants set forth above in its Credit Agreement with Credit Suisse. Again, instead of disclosing this truth, Defendants' Exchange Materials omitted to disclose this information and, instead, materially misstated or misled investors as to the Company's true condition.

39.     Thus, in the false and/or misleading statements specified above, Defendants either dramatically downplayed the truth or did not disclose the truth at all.

40.     The Defendants' deceptive behavior continued after the Registration Statement was issued.  On January 6, 2011, Defendant Reese spoke at the Pritchard Capital Partners

Energize Conference.  During the call, Defendant Reese made the following materially false or misleading statements:

> We are an experienced operator. We've been doing this since 1991. We actually celebrate our 20th year in business in August of this year, and we will be celebrating our 10th year as a public company in February of this year.
>
> We've had consistent reserve growth throughout every cycle you can think of in pricing from $147 oil to probably $20 oil during that period of time, and gas has been just as dramatic with the issues that have hit the industry during 2010 -- talk about those little bit.
>
> We have proven, we have forecasted production growth. You can see our production growth for this year, and as we go into next year, we do have a strong liquidity position. And we have in what else -- what you'll see here at the very end -- kind of what I think is a very compelling valuation for the Company itself.
>
> ***
>
> We do expect, and I'm out on a shaky limb, I will admit, but we do expect to get our permits for the Gulf of Mexico this year. We're looking for four permits -- two at Telemark, two at Gomez. I still say that we will be able to achieve a first permit at Telemark, and this is for the 941 #3 well during the first quarter, of this year. Is it next week? Is it a Valentine's Day present? Is it St. Patrick's Day or March the 31? I'm not quite sure, but I'm going to stick with the first quarter as to when I expect to get that first permit.
>
> The second permit at Telemark will come after that one, and Gomez will come after those permits. But we do expect to be able to get all four permits this year. That is based on what we know today. Obviously, that's always subject to interpretation by the BOEM. But, that's where we are with it.
>
> ***
>
> There has to be drilling that started, and we think that we are on the cusp of being able to get new permits not only for us, but for a lot of others that are out there.
>
> ***
>
> We do have a strong liquidity position and let's face it, one of the reasons the stock price I think continues to linger is because of the moratorium. As the moratorium and the impact gets relieved, I think that uncertainty is going to be reduced. You've seen that happen over the past few weeks, just this week alone with the letter from the BOEM.

41. On February 22, 2011, Defendant Morris spoke at the EnerCom Incorporated The Oil & Services Conference. During the call, Defendant Morris made the following materially false and misleading statements:

> Moving into some of the meat, now I'm going to go through some specific properties, give you an update on that, but before, let me do a light touch on the permitting, deepwater permitting, in the Gulf of Mexico. I could stand up here and talk for two hours easy. But let me say that permitting in the deepwater Gulf of Mexico has been frustrating at the least. It's taken a long time. We've struggled through, but most recently we have seen potentially a major breakthrough in that permitting process. Within the last 30 days, you had the Marine control -- Marine well control group, which would be Chevron, Exxon, Shell, those guys. Then you've got the Helix, fast response group. All of them have been -- both of them have been developing cap and containment systems in the event of something similar to Macondo. ATP is a member of the Helix Group, 20 companies that belong to that group.

42. On March 15, 2011, the Company held its year-end 2010 earnings conference call Defendants Bulmahn, Reese and Tate participated in the call. During the call Defendants made the following materially false or misleading statements:

> PAUL BUHLMAN:  Through creative, albeit expensive financing, we are now liquid and solid. Our operational excellence and prowess are safe environmentally sound drilling stands ready to perform. We have maintained a consistent schedule of construction of the Cheviot/Octabuoy, ATP's second billion dollar Hub, this one designed for the North Sea.

> UNIDENTIFIED PARTICIPANT: In terms of liquidity, do you expect to go into the market in terms of first lien debt or equity for the remainder of the year

> AL REESE: This is Al Reese. We have -- on our first lien debt we have already put in place the expansion of our first lien debt. That goes from $150 million to $210 million, so that piece is already done. There are no plans at this point to do any equity transaction this year.

> UNIDENTIFIED PARTICIPANT: So that $60 million additional and first lien would be enough to cover your cash-flow requirements for the remainder of the year?

AL REESE: Yes, with the existing cash that we have, with that, with the Titan facility. Some other things that we're currently looking at, we feel very comfortable with our liquidity position for the entire 2011 as we go into 2012. That's either with or without permits from a liquidity standpoint.

43.    On April 13, 2011, Defendant Bulmahn spoke at the IPAA OGIS New York Conference.   During the call, Bulmahn made the following materially false or misleading statements:

Our diversified asset base of international reserves and reusable deepwater platforms have a current value exceeding $7.7 billion. ATP's liquidity is strong, and we are presently reducing our debt with NPI and override payments. As recently as March 2011, ATP increased first-lien capacity by adding $60 million of liquidity.

We also lowered our interest rate from 11% to 9% and we moved out our maturities by four months to January 2015. We were able to add a further $50 million of liquidity from the ATP Titan, also in March. And ATP will continue to pursue monetization strategies for other infrastructure assets.

With major capital expenses already incurred to bring Telemark production online, going forward we will be able to manage leverage and liquidity at levels satisfactory to the market. To maintain our capital structure, we will continue our active oil and gas hedging program and maintain a comprehensive insurance program. But significantly, with higher oil prices coupled with significantly higher production, this should result in a substantial increase to our EBITDA and our cash flow for 2011.

44.    On July 19, 2011, Defendant Reese spoke at the Global Hunter Securities Energy, China, Metals and Mining Conference.   During the call, Defendant Reese made the following materially false or misleading statements:

We have done a liquidity operation in the second quarter. We did a convertible preferred offering; $172 million here. Really the key of this particular thing was that we also put in place a capped call.

***

We have also done a couple of overrides. The question would be -- we didn't think you needed liquidity; what did you do that? I will address it head on.

And the answer is this. We are in the Gulf of Mexico deepwater. I fully expect to

have the permits. I fully expect to have the third well on at Telemark. We fully expect this to be a light hurricane season. I will go into all the reasons why we would not necessarily need to do any form of capital raise.

On the other hand, I am 62 years old. I have been in this business for a long, long time. I am seeing some people in the audience that have been in and around for a long, long time also. And things can happen.

This literally does nothing more than improve our liquidity. It protects us in the event there are any issues in the Gulf of Mexico this year. And in the longer term, as we begin to see more and more permitting become available, that gives us the ability to move forward with other operations.

45.     On August 9, 2011, the Company held its earnings conference call for the second quarter ended June 30, 2011.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially false or misleading statements:

PAUL BULMAHN:   Regarding our financial performance, ***ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter. Revenues from oil and gas production are on target to expectations, although ATP had to forgo 15 months of material production revenues and the earnings loss is higher due to one-time impairments and other adjustments.  In the wake of everything going on in the financial markets, we are managing all controllable elements and addressing everything we can impact.***

*** 

We are not distracted or over reacting to circumstances all around us.  Our focus is long-term. I am confident ATP will overcome the current chaos in the marketplace and our stock price will adjust accordingly as we bring on material production at Telemark.

*** 

GREGG BRODY: That's helpful. Just coming back to your current CapEx guidance.  I appreciate the update on the second half guidance. Can you remind us how much of that is contingent upon permits and how much is not? Just a lump number.

LELAND TATE: This is Leland. That money gets spent at Gomez, Clipper, Telemark Hub, and Cheviot. Cheviot is not contingent upon permits at all. The Telemark Hub, obviously the next well, we do not have the permit in hand yet, so

we have submitted all required documentation. And this is a point where I would like to make a point.

If you look back at history, the MMS seldom approved the well until a few days before the well was required. It is just the nature of the way they give you well approvals. They will tell you, yes, we see everything; it's all there. We'll give you an approval. We are working it and it usually comes a day or two before which is why we have regulatory departments to stay on top of this. I expect exactly the same thing to happen here.

942 # 2 has been applied for, and we've answer all of the questions they have. The last thing in the new regulations that are required is you have to recertify the BOPs. We'll have to move that before we can move to 942 # 2. And as I said, we will have to do that before we move from the Clipper first well to the Clipper second well. They won't tell us we have those well permits approved until that is done.

I do not believe there will be any holdup whatsoever on getting those wells approved, but you asked about the permits question. At Gomez, the 7-11, 9 and 10 wells obviously require permits. They are out late this year and early next year. In anything event, we should be able to get those wells approved.

It could be, I'll will use, 30% to 40% impacted by permits but I don't believe that it will be. I think we will get every one of those approved and we'll be able to implement that budget as we put it forward.

GREGG BRODY: I guess just a follow-up to the permits, I know Al spent a lot of time in DC. Al, what is your current view on how proactive the Administration is being right now and the movement of permits?

AL REESE: This is Al Reese. I think what you're finding now is this, the BOEM is essentially running the show at this point. I honestly believe that prior to February of this year the Administration was deeply involved with when the permits were going to be issued. I really think the major item occurred in February, and that was when the BOEM was satisfied that the containment was available and this was both with the Exxon [demajores] plan as well as the Helix plan. We participate in the Helix plan.

Since then, you have had 15-plus permits issued since February 28.  I honestly believe on the permitting side today, the BOEM is in charge; and they do get some direction from Washington, DC, but clearly I think you are beginning to see more and more permits get issued.

On the legislative point, yes, Administration is still involved. I don't anticipate any major legislation this year primarily because Congress has got enough stuff on their plate without having to worry about deepwater drilling and things of that

nature.

***

CHUCK BENNETT, ANALYST, IBC: Good morning, guys. I waited a long time, I almost forgot what I had to ask you. Most of my questions were asked, so I'm glad you saved the best for last. So, right now, I know you're not going to comment on your stock or anything, but for the last three or four months, you have been getting beaten down pretty good from $16, $17 a share. And it seems like the perception out there is that they think that -- they are basically pricing in bankruptcy on the Company. I own a lot of the debt, I've see the bonds come down, but what is horrible is the stock. Now, that being said, I question, what would you say, and it's a masters position, you've got about a 35% short position, what would you say is the short position out there as something to end of this call on? Because I've got to tell you guys, there is a big position betting against you. And if we're going to end this call now, what would you say, a few positives that you would tell the short position just before they would leave?

LELAND TATE: I think that's an excellent question, and ***I think it is safe to say that we are very bullish on where we are right now,*** and going forward having just drilled a highly successful Clipper well and with the efforts at Gomez and Telemark and the days that we are away from bringing the Telemark well on, I recognize that the last 15 months when we have been unable to bring on this material production to the Company, during that period of time, we've had to do a number of efforts to try to continue to keep the Company going in the face of the delay that we have had in being able to address these two wells, both of which were pre-drilled to 12,000 feet in case.

I think we certainly have very strong emotions about the fact we were unable to address that simple effort for this many months, and I believe those two wells alone, when they come on, and we anticipate both of them coming on before the end of the year, I believe that we'll reestablish what the position ATP should have been in 15 months ago. ***And I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all. That I think we certainly are on sound footing and moving forward well and making things happen globally as well.***

(emphasis added).

46.     On August 17, 2011, Defendant Bulmahn spoke at the EnerCom Incorporated The Oil & Gas Conference. During the call, Defendant Bulmahn made the following materially false or misleading statements:

Clipper, you may have seen an announcement last week, and we will go into that a little bit more, with follow-ons from Entrada and Green Canyon 37 as we move

17

into future years. ***Basically what we've done is timed these assets to meet our cash flow -- to work within our cash flows and be able to develop them.***

(emphasis added).

47.     On September 12, 2011, Defendant Reese spoke at the Rodman Renshaw Global Investment Conference.  During the call Reese made the following materially false or misleading statements:

> This is really to address one of the valuation slots. ***If you look at what is ATP valued at today, we honestly believe that the shares are probably undervalued. I doubt if any company is going to sit up here and tell you they are overvalued, but we honestly believe that there is a very, very large disconnect between the value of our shares and the like.***
>
> ***
>
> Looking at the overall failure [future] of the Company, I will let you look at the numbers here. But if you look at our total debt or you look at our net debt, what you find is the net debt is completely covered by our proved reserves.
>
> The infrastructure is all on top of that. On strip pricing, the net debt is about half of our proved reserves. With all the probable sitting on top of that and all the infrastructure on top of that.
>
> ***So when it comes to a true valuation we don't just sit here and say we think our shares are undervalued. We try to use charts and graphs that show why.***
>
> ***
>
> Long-term debt, I've heard it once, I've heard it twice, I've heard it many, many times. You are a company that has, you have a lot of debt in here. You have a lot of debt in your Company. What do you do about your debt?
>
> The real key here is the structure of the debt. There is nothing more expensive for a company than having inappropriately structured debt. I don't care if it's $1 or $1 billion or more. You do not want debt that is not structured properly.
>
> ***
>
> In addition to that, we also retain the upside associated with those properties. So when that NPI or override is paid off, the residual comes back to us. As a result, GAAP accounting says that is a financing, it is not a sale. So these are on our books.

18

The real key on this is there is no schedule. Debt service on this, there's no schedule. Interest payments on any of our NPIs or overrides as higher prices come in, higher production, you have a faster payoff of these properties. As lower prices, lower productions, you have smaller payments. If you have no production, there is no payment required.

We expect by the end of 2012 most of these overrides and NPIs will be off the books. Still have a few that will extinguish -- that will go into 2010. Excuse me -- 2012, but most of these will be gone by the end of 2012.

*** 

As time goes through the remainder of this year, well you will begin to see us put numbers around here, but this is really what we are focused on for next year. **CapEx will be within the cash flow of the Company.**

In summary, we have got a strong reserve base, for barrels, for BOE of proved and probable reserves per share. Production expects to be ramping not from exploration that we hope to hit, but from execution of properties that we have. ***And we have got a solid capital position, our debt is married with our production program, is married with our development program.***

(emphasis added).

48.     On November 9, 2011, the Company held its earnings conference call for the third quarter ended September 31, 2011.  Defendants Bulmahn, Reese and Tate participated in the call. During the call Defendants made the following materially false or misleading statements:

AL REESE: On the overrides and NPI's that we do that have been investor based, those have stated interest rates and most of those stated interest rates are from the low double digits to the mid-double digits for the actual amount. Again, as it takes longer to pay these back you end up having a larger interest component. The good part about it, Paul touched on this earlier and I spent a lot of time last night and the day before really looking through this. If you look at our revenue base now what you find is that last quarter we had $172 million in revenue, this time it is $170 million.

That is the last time we had revenues of that nature goes backing all the way to the first part and second part of 2008. So it certainly looks as if the moratorium, while it is behind us, permits are beginning to roll, with the pricing that we are getting. I realize some people are disappointed with the production for this quarter as we go in to getting the fourth quarter on, we get into the first quarter of next year when we will have the additional well on at Telemark, I think what you will see is the NPI's and overrides begin to pay down fairly faster than we are paying right now which will reduce the interest component. Longer answer than you may

have been wanting but I you think it sets out not only the tone of these but how these are getting repaid.

49.     On January 4, 2012, Defendant Reese presented on behalf of the Company at the

Pritchard Capital Partner LLC "Energize" Conference.  During the presentation Reese made the

following materially misleading statements:

> Now I want to spend a little time talking about the financial overview of the Company, and yes, I have read all of the information, both pro and con about ATP that's out there. I won't name names either way, but I think there are a lot of people that are not necessarily betting for ATP. I think some understand the story much better, and what we have in looking at all of the reports that have been written about us that are in the market today, I've not heard any of the reports, regardless of how negative they are, that talk about a deterioration of the asset base.

> So when it comes to the assets of the Company, the assets are still strong and intact. You can see here, on the proved and probable reserve base -- and this is based on last year's reserve report, SEC pricing as of last year updated for strip pricing now. *But what you see is that our entire debt is completely covered by our proved reserves. And sitting on top of that is the infrastructure, some more proved reserves, as well as the probable reserves. Net debt and total obligations of $2.4 billion; you'll see a chart in the back in the appendix that lays that out. But when it comes to a valuation of ATP, this is where we think that you will find that there is a very strong, compelling value of the Company.*

> *Our long-term patient corporate structure -- a lot of the things that they are talking about is our ability to make interest payments, the ability to focus on our maturity of the bonds. These occur in 2015. Between now and 2015, we expect to have Telemark in full production, which will be '12, Clipper in full production which will be '12, Entrada at full production, which will be 2013 or 2014, and then Cheviot at full production beginning sometime in 2014, 2015. Those are the production ramps that we see occurring prior to any form of maturity associated with any of our bonds, and the key component on here is in red at the bottom, that there is no financial maintenance covenants, and facilities can be expanded*. As we look at our first lien basket capacity right now and we look at our PV-10, what you find is that we are expecting maybe as much as $100 million of additional liquidity will be added through the first lien basket based on our initial PV-10 estimates. That's not final at this point. It could be more than that, it could be less than that. *But as we look at it today, when you look at liquidity, and this would be first-quarter liquidity, we're looking at close to $100 million of additional capacity.*

***

Options for funding our 2012 capital budget, operating cash flow we, do expect strong improvement for once Telemark comes on and gets into full production. Clipper production will commence later in the year. First lien expansion capacity -- I already mentioned $100 million, more or less, that you'll see during the first quarter. Partnerships -- we are in active discussion discussions about bringing partners in on both Clipper and on Cheviot. And we are continuing to tap the NPI and the override markets. We've already closed the $15 million; we did it quietly at the end of last year, just last week. This is an existing override owner that liked what he saw and wanted to put some additional capital to work, and we are always working on monetizations of some of our infrastructure.

In summary, we've got a strong reserve base, over 200 million of proved and probable reserves, 59% oil, in total, so we are an extremely oily company. 6.6 billion of proved and probable reserves -- I would expect that. No promises, I would expect that number to creep up as we get into our final reserve report, plus the infrastructure, a 98% success rate. Israel represents a very low cost, very high reward opportunity. Production is ramping. We do expect that to continue up and to the right in 2012, both from Clipper and at Telemark. ***And a strong capital position in the fact that most of our 2012 projects are completely discretionary. We've got many levers to pull to either bring in cash or to reduce CapEx. And the debt that we have that people seem to be so worried about has no maintenance covenants at all that we associate to it.***

(emphasis added).

50.     On March 16, 2012, the Company held its earnings conference call for the year

ended quarter 2012.  Defendants Bulmahn, Reese and Tate participated in the call.  During the

call Defendants made the following materially false or misleading statements, among others:

PAUL BULMAHN:   Regarding ATP's 2011 results, I will be brief to enable us to move to questions rapidly.  Our revenues were up 57%. Production in 2011 was a 17% increase our expenses were managed down.  The value of proved reserves were up cash flow is improving.  ***And we continue to expand our liquidity*** after bringing the fourth Telemark well on production.

*** *** ***

GREGG BRODY, ANALYST, JPMORGAN: Just touching more on the liquidity, you mentioned a few other things in the past couple weeks.  The first one being the overriding royalty interest, that you were discussing possibly raising another $100 million.  Can you tell us where that stands?  And could you provide a little bit more color around anything else that may be liquidity?

AL REESE: Sure.  Let me go through the liquidity transactions that we have executed this quarter.  I know we have talked about them individually, but just to wrap everything up.  Thus far this quarter, we have executed a new $60 million asset sale of an overriding royalty interest on Gomez, $60 million there that closed earlier in March.  We recently, yesterday, executed a $20 million sale on Gomez. Again, another overriding royalty interest.  And as of this morning, we executed and finalized a $155 million expansion of our first lien. I was on the conference call earlier this morning for the due diligence bring-down.  That has funded, and the money is in the bank on that one.

What we expect to do, and this is all signed, sealed, and ready to be closed next week, is an additional $100 million.  This will be on Clipper. ***This is for essentially the $100 million that will be used for the installation of the pipeline that is scheduled to take place beginning in the third quarter of this year.*** We've obviously got some expenses before then -- ordering the pipe, getting some of the engineering and things done there.  But that is a $100 million override that should close sometime next week.  And that is, obviously, a very major component of the roughly $125 million or so of capital that we have allocated for that this year.  So, that is all the overrides.

***

ALLAN YOUNG, ANALYST, RAGING CAPITAL MANAGEMENT: ***Just very simply, if we look at the Telemark coming on production now, the Clipper wells at the end of the year alongside some of the financing transactions you have announced to-date, is it fairly clear that at the end of the year we should be at a production run rate, given current energy prices, where we are then able to fund capital plans going forward internally?***

PAUL BULMAHN: ***Yes. I could give a longer answer, but the answer is yes.***

(emphasis added).

51.     On April 17, 2012, Defendant Reese participated in the IPAA Oil & Gas Investment Symposia.  During the call Reese made the following materially false and misleading statements:

Want to spend a little bit of time here talking about where ATP is in its lifecycle.  To tell you that the moratorium had an impact on us, I don't think I'm telling anybody anything they don't already know. We put in place literally the day before the bond issue occurred -- excuse me -- before Macondo exploded -- we put in place a $1.5 billion high-yield offering literally the day before.

***During the past two years, we have dealt with trying to work through the***

*uncertainty associated with the moratorium. The good part about it is that is essentially behind us; the moratorium officially ended over a year ago. What you see in the Gulf of Mexico now is permits are beginning to flow. They are coming in a more predictable fashion. They are more expensive and they are going to take more time. But at least that piece of -- is behind us. And that really takes us to the inflection point that we are in today.*

We are experiencing significant improvement in our production rates. We continue to be an oil-based company. I think you will continue to see the company get oilier over the years. We do have a substantial decline in the amount of infrastructure that we are going to be spending money on. Spend a little bit of time talking about the Octobuoy in a second.

*Growing production and cash flow. We will continue to do that.* In doing so, we will continue to pay down some of the overrides and the net profits interest that we have. And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil.

*Liquidity is sound. I've heard all of the questions and comments about the liquidity. We ended first quarter with over $200 million in cash. We have no near-term maturities or maintenance financial covenants. They do not begin -- maturity doesn't start until 2015.*

\*\*\*

What you see on the right is the artist's conception of the Octobuoy, which is currently under construction in China. That project will be ready over the next year. Hull should be ready sometime early to middle 2013. And the topsides will be ready sometime around middle to the end of '13.

Keith Godwin, our Chief Accounting Officer, will be in China starting next week. *We are in conversation with one of the Chinese banks to finance that property. We are in multiple term sheet stages of turns. I can't say Keith will bring back a signed term sheet next week, but that is how close we are to being able to finalize the monetization on that.* Right now, it is designed to where it will monetize as the hull is finished and as the topside are finished, and the funding is about a $400 million funding that should be coming in 2013.

\*\*\*

Right now -- Leland was going to be joining me here at the IPAA conference. He was going to be a co-presenter. Fortunately, he was not able to make that commitment because he is over in the UK even as we speak, meeting with potential partners on Cheviot. *We are seeking partners and we opened a data room back in November and December. That has now gone to about three or*

*four entities that are extremely interested. We have term sheets circulating with some. Some are these are multiple meetings that we've had with them. Hopefully, we will be able to announce a partner on Cheviot middle part of this year, with execution sometime before the end of this year.*

\*\*\*

*Long-term capital and leverage. First-lien and second-lien debts have no maturities, they have no -- or no financial covenants, maintenance covenants. I know a lot of people talk about our debt. I will spend time talking about that in the breakout session. But what I can say is I am not worried about the maturities of our debt.*

\*\*\*

This is our capital outlook for the year. We will spend about $400 million, $500 million this year. Part of that is going to be contributed by some of our vendors through existing NPI programs. And as you can see here, I have talked about most of these projects during the year, so I'm not going to spend a lot of time going over these specifically again.

Again, key investment highlights. *We are at an inflection point. I think ATP will be a very different company at the end of 2012 than we were at the end of 2011. Liquidity is sound.* We have deepwater operating experience, both here and the North Sea and soon to be in the Israeli area. A fleet of floating reusable deepwater structures, substantial asset value and an extremely strong alignment between the shareholders of the Company and the management of the Company.

(emphasis added).

52.     On May 10, 2012, the Company held its earnings conference call for the first quarter 2012.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially misleading statements:

PAUL BULMAHN:  I think it's appropriate to note, we are not pleased or satisfied with the first quarter, except for the completion and beginning production of the fourth well at Telemark. We have continued the work-over of a Telemark well to increase its production, that effort hopefully will be successful during the second quarter.  *ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt.  We have made every payment, including the most recent $90 million payment on May 1. We are looking forward to the third and fourth quarters,* having successfully drilled and completed two deep water wells at Clipper, which are scheduled to produce after the pipeline is laid and connected up.  And, we have continued to move forward

with the work to tie them back to the Murphy Frontrunner platform.

\*\*\*

RICHARD TULLIS, ANALYST, CAPITAL ONE SOUTHCOAST, INC.: Al, just continuing with some financial questions, how much more do you anticipate the payables being reduced this year, 2Q through 4Q?  I see, I guess it was the working capital deficit was improved by, I guess, $100 million in the first quarter. How much more of that do you expect remainder of 2012?

AL REESE: I'm not going to put out a specific number, goal or target.  I think what you will see as we go through the second quarter and into the third quarter, there will -- it will essentially trend flat as we go through the development of Clipper, getting Clipper online, going through the exploration well in Israel.  As we begin to get into the third quarter, particularly into the fourth quarter, with the fact that we no longer will be working at Telemark, and all the production that we are talking about at Telemark, we will have full production, right now scheduled in third and fourth quarter, Clipper coming on in the end of the third quarter, beginning of the fourth quarter.  ***You will see a very significant shift in revenue increase and capital decrease.  As a result of that, I think you should see a very significant improvement beginning in the third quarter, but certainly during the fourth quarter.***

\*\*\*

BROCK MALKY, ANALYST, INSIGHT CAPITAL: I just wanted to double back around the CapEx.  It sounds to me like your CapEx guidance is back-end loaded and substantially related to work on the Octabuoy.   So, my question is this.  Included in your guidance of $400 million to $500 million, then we back out the NPIs of $50 million to $70 million, so let's call it $350 million to $450 million in CapEx spend going forward.  If you get the Octabuoy sale lease-back, or some type of a deal done, are you including anticipated CapEx for Octabuoy into that guidance?  So, if you get that deal done, then that anticipated CapEx gets wiped out, effectively, once that deal gets done?

AL REESE: Yes.

BROCK MALKY: Okay, so what percentage of the CapEx in the CapEx guidance is Octabuoy?

AL REESE: I don't have an exact -- this is Al Reese, I don't have an exact number to give you for that.  But what we have said before, in previous presentations, is somewhere around half of our program this year relates to the Octabuoy or Cheviot.  So, it's probably a little high, it's not abnormally high, but that will get you in the right area of what we would be looking at for an amount to be incurred for the remainder of this year.  Now, most of that is dealing with the topsides, we are having the topsides built here in the United States, and the process module is

being built here in the United States, the utility module is being built in China. The whole is substantially complete, although it still has some work that needs to be done later this year and into the early part of next year.  So, that's where most of that CapEx is going to be going for the year.  *If we are successful, and we are optimistic we will be, if we are successful in being able to execute a financing for, or with this -- the Chinese groups that we are talking with, it will, essentially, completely pay for all of the remaining CapEx on the Octabuoy, for the balance of this year as well as into 2013.*

BROCK MALKY: So your CapEx would effectively -- the guidance would get knocked down to $250 million at the high end from that $500 million because you are effectively eliminating that cost which you have put into your CapEx guidance?  And going forward, effectively, if you land that deal and that's to me -- what that says is, we don't spend any substantial amount of money going forward to arrive at next production at Cheviot, is that right?

AL REESE: Yes, with a clarification.  The Octabuoy is -- the financing there, we will still show the capital being spent, so it will still be in our capital program. The only difference is now we will have an actual source of financing for that.  In addition to the Octabuoy, we do have the reservoir development at Cheviot.  We will spend a little bit on reservoir development this year, obviously all pre-engineering stuff, we would expect to bring a rig out there sometime in either '13 or '14, and begin the actual reservoir development.  So, the reservoir development is capital that we would be spending, beginning sometime in '13 going into '14. But the Octabuoy itself would be completely taken care of by this other financing.

BROCK MALKY: A lot of negative sentiment surrounding the share trading.  I think that the market is very fearful of some significant dilutive financing on the equity side.  And, I just have to address some of this negative sentiment, you guys have done a spectacular job in avoiding any share issuance in a very difficult environment. You've gotten creative, you've effectively raised $700 million, $800 million in vendor participation financings, and I just can't believe that the Street doesn't understand what a big deal that is. I mean, you've saved us $800 million, $700 million worth of equity offerings through getting creative with the vendor financings and the participations.  So I, for one, want to thank you guys for not diluting off the shareholders and stick in as management, you get my vote all day long.

AL REESE: Okay, thank you.  Brock, we really appreciate it.

PAUL BULMAHN: And we appreciate that you recognize some of what we've been able to accomplish over a span of time.

BROCK MALKY: Well, we went through -- I'm a long-term shareholder, and we went through this back when oil collapsed, and the stock traded briefly under $3.00, and the fear then was the same as now.  Hey, this company is going to have

to do a massively dilutive financing, to get to Telemark production because we've calculated the CapEx at $700 million, $800 million.  Or worse, they are going to breach a covenant and it's going to be over.  Well, you guys didn't breach the covenant, and you laid out a plan, the plan being we are going to monetize infrastructure.  You did just that, you averted any type of significant dilutive financing, and -- here we go again.  So I appreciate you guys doing what you're doing and stay with the course.

PAUL BULMAHN: Thank you, Brock.  And on that note, I think it's appropriate to move to the close.  *I think, just to reiterate, we are certainly looking forward to the third and fourth quarters, because, I think, the two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest.  We have also kept the Octabuoy platform construction moving forward, and I'm really proud of what we've been able to accomplish there, on both the construction and the financing front.  But I appreciate very much the relationship that we have with the Chinese.  We've established a number of relationships that we value, and also, I just underscore what Leland said when he noted the progress that we've been able to make in opening up operations in deepwater Israel, which is real upside to the company, if it's successful.*

(emphasis added).

53.     On August 10, 2012, ATP's stock price plummeted, closing at $0.36, down $1.13 from its opening price of $1.49, amid reports that the Company may file for bankruptcy.

54.     On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion and announced that it was going to continue operating during its financial restructuring, using $618 million in DIP funding. The Bankruptcy Action is captioned *In re ATP Oil & Gas Corp.,* U.S. Bankruptcy Court for the Southern District of Texas, No. 12-36187.

55.     ATP's press release stated that:

HOUSTON, TX – August 17, 2012 – (Business Wire) – ATP Oil & Gas Corporation (NASDAQ: ATPG) today announced that it has filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. ATP has taken this action in order to undertake a comprehensive financial restructuring. ATP expects its oil and gas operations to continue in the ordinary course throughout the reorganization process and sees the reorganization as a helpful step towards deleveraging the company to position it for future development of its assets. ATP

27

believes that the rights and protections afforded it by a court-supervised reorganization process, including the ability to access new financing, will provide ATP with the time and flexibility it needs to fully address its financial challenges and position ATP for long-term viability.

The primary reason for the reorganization began with the Macondo well blowout in April 2010 and the imposition beginning in May 2010 of the moratoria on drilling and related activities in the Gulf of Mexico. These events prevented ATP from bringing to production in 2010 and in early 2011 six development wells that would have added significant production to ATP. As of the date of this filing, three of these wells are yet to be drilled. Had ATP been allowed to drill and complete these wells ATP believes it would have provided a material production change in 2010 continuing to today. This projected increase in production should have substantially increased cash flows, shareholder value and allowed the company the ability to withstand normal operational issues experienced by owners of oil and gas properties in the Gulf of Mexico. In addition, these incremental cash flows would have mitigated or prevented the need to enter into many of the financings ATP has closed since the imposition of the moratoria — financings that require relatively high rates of return and monthly payments.

56.     On this news, the price of ATP stock fell an additional $0.16, to close at $0.30 on

August 20, 2012.

57.     A Declaration filed by Defendant Reese in the Bankruptcy Action indicated that

ATP's problems were pervasive, long-standing and well known to the Defendants.   The

Declaration stated in pertinent part that:

As detailed further below, due to adverse operational exigencies stemming from the 2010 Gulf drilling moratoria as well as subsequent events, ATP finds itself with over $2 billion of indebtedness and less than $10 million in cash as of the Petition Date. However, the path to considerable, short-term improvement is clear, as the Debtor has a very promising, already-drilled project – the "Clipper Wells" project – to which it simply has to complete a pipeline. At the time of completion of such pipeline, originally scheduled for October 2012, the Debtor's cash position should measurably improve, and much of the relief sought in the First Day Pleadings is targeted toward meeting this paramount goal as soon as possible.

In early 2010, ATP looked to the bond market to raise funds necessary to develop infrastructure and conduct offshore drilling under a program designed to capture known proved reserves and significant revenues. On April 19, 2010, ATP priced the $1.5 billion offering of the Second Lien Notes. These bonds priced the day before the April 20th explosion and blow-out of the Macondo well facility that led to the shutdown of operations in the Gulf of Mexico. Less than two weeks later,

the U.S. government issued the first of three moratoria on further drilling in the Gulf of Mexico.

The delay on operations and the increasingly uncertain regulatory environment adversely affected ATP's operations and planned development that was necessary to service its additional debt. Despite statements that the moratoria had been lifted at various points in time, the government did not issue new deepwater drilling permits until February 28, 2011, thus effectively extending the moratorium. As a result, ATP was unable, despite access to funds, to drill and bring on-line six new wells during 2010 and 2011. In addition to the high costs of interrupted and discontinued drilling operations in deepwater, ATP continued to incur construction costs on the Octabuoy, its newest deepwater production platform, as a discontinuation of work of the platform would have led to significant escalation in cost-to-completion once work resumed. Moreover, as access to deepwater rigs became limited, ATP also experienced higher than expected costs in preserving its access to equipment during the moratoria.

During 2010 and 2011, ATP had commenced and was in the process of drilling and completing six wells in its program, all of which were disrupted by the moratoria: (i) the Mississippi Canyon 941 A-1 well, which was drilled to 20,000 feet total depth but had completion halted during the early stages of the moratorium, (ii) the Mississippi Canyon 941 A-2 well, which was previously drilled to 12,000 feet, but could not be drilled to its targeted total depth of 20,000 feet until March 2011 when the drilling permit was issued, (iii) the Mississippi Canyon 942 A-3 well, which was drilled to approximately 12,000 feet and suffered the same fate as the 941 A-2 well, and did not receive its drilling permit until October 2011, (iv) the Mississippi Canyon 305 (Canyon Express) side track well, which initially received permits in early May 2010 (after the first 30 day moratorium), only to have its permit pulled less than three weeks later, when the first six-month moratorium was issued on May 30, 2010; (v) the Gomez #9 well, which was delayed indefinitely; and (vi) the Gomez #10 well, which was also delayed indefinitely. Each of these wells were targeted because they are located in close proximity to either the *ATP Innovator*, the *ATP Titan* or the Canyon Express pipeline system, and their development was part of the economic model justifying ATP's investment in this infrastructure.

When the moratorium was effectively lifted in March 2011, ATP received permits and attempted to generate production from these projects as quickly as possible. By February 2012, ATP was able to complete the Mississippi Canyon 941 A-1, A-2, and Mississippi Canyon 942 A-3 wells in its Telemark field and connect them to the *ATP Titan*. To date, because of liquidity constraints, ATP has not been able to return to drill the Mississippi Canyon 305 well, which is on a very large dry gas reservoir producing through the Canyon Express pipeline system, or either of the Gomez #9 and #10 wells, both of which would have tied in to the *ATP Innovator*.

***

*Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems, which were exacerbated by less than expected production rates at ATP's Telemark Hub and cost overruns on the Octabuoy. ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position.* ATP diligently sought to solicit potential partners, joint operators, or investors with respect to its foreign operations to share in the development costs of its North Sea and Eastern Mediterranean oil and gas properties. Although it is generally recognized that the reserves and operations of ATP's foreign affiliates have significant value, ATP has not yet been able to complete a transaction with any parties that will bring in enough financing to complete the construction of the necessary infrastructure to start generating new production from these foreign deepwater operations.

***

*Despite ATP's best efforts, it was unable to overcome the impact of the moratoria when ongoing project construction costs, declining oil prices and less than anticipated production put it in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying its situation. In the period leading up to the Petition Date, ATP found itself facing a severe liquidity crisis, with a cash position of less than $10 million and a substantial backlog of trade payables and amounts due under overriding royalties and net profit interests totaling, in the aggregate, over $70 million, along with substantial payments due on the Second Lien Notes later this fall. ATP's inability to make current payments on many of its obligations have resulted in a number of notices of default and lawsuits from its creditors, with some seeking prejudgment relief (such as temporary restraining orders or writs of sequestration) that could further restrict the Company's short-term cash flow and liquidity.*

58.     During the course of the Bankruptcy Action, the Company belatedly began to reveal the truth regarding its business operations, revenues and liquidity. Specifically, Defendants finally began to disclose the true extent of the losses that the United States Department of Interior moratoria caused the Company to incur. Indeed, Defendant Bulmahn blamed the moratoria for the Company's bankruptcy, saying that it was "directly attributable to what the government did to us." However, such losses were substantially quantifiable during the Class Period and dramatically understated the true impact of the moratoria on its deep water

30

operations in the Gulf of Mexico.  Indeed, during the Class Period, Defendants' misrepresented the Company's business prospects, financial condition and liquidity.

59.     Proceedings in the Bankruptcy Action have also belatedly begun to reveal that the Company had failed to sufficiently disclose its prior involvement in asset sales that the Company now admits were "disguised financing" arrangements designed to evade the requirements of its Credit Agreement with Credit Suisse. As revealed by a complaint filed in the Bankruptcy Action, "ATP could not have been a party to financings ('disguised' or otherwise) without being in default of its obligations under its credit agreement(s) . . . ." Docket No. 12-36187, Doc. No. 1558 (S.D. Tex. March 8, 2013).

**Scienter**

60.     As alleged herein, Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding ATP, their control over, and/or receipt and/or modification of ATP's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

61.     Each Defendant was motivated to delay disclosing the true adverse facts based on ATP's need to raise the capital it needed to continue as a going concern.  ATP relied on its ability to raise funds and borrow money.  Without the availability of outside funding, the Company could not continue its operations.  Thus, instead of disclosing the known adverse facts

as they became known, the Defendants delayed such disclosures.  As an example, the Defendants continuously represented that the necessary drilling permits would be forthcoming and that the Company's liquidity, when they knew or should have known, in the absence of recklessness, that was not the case.

**Loss Causation/Economic Loss**

62.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ATP common stock and operated as a fraud or deceit on Class Period purchasers of ATP common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of ATP common stock fell precipitously. As a result of their purchases of ATP common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

63.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of ATP's business and prospects, financial position, and results of operations. Defendants' false and misleading statements caused ATP common stock to trade at artificially inflated levels throughout the Class Period.

64.     The decline in value of the common was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline of ATP common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class

members was a direct result of Defendants' fraudulent scheme and caused the subsequent significant decline in the value of ATP common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**No Safe Harbor**

65.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of ATP who knew that those statements were false when made.

**Applicability of Presumption of Reliance: Fraud on the Market**

66.    At all relevant times, the market for ATP common stock was an efficient market for the following reasons, among others:

a.    ATP common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, ATP filed periodic public reports with the SEC and the NASDAQ;

c.      ATP regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      ATP was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.      As a result of the foregoing, the market for ATP common stock promptly digested current information regarding ATP from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of ATP common stock during the Class Period suffered similar injury through their purchase of ATP common stock at artificially inflated prices and a presumption of reliance applies.

**CLAIMS**

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder by all Defendants**

68.      Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

69.      During the Class Period, the Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70.     The Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

71.     Plaintiff and the Class have suffered damages in that they would not have purchased the common stock at the prices they paid, or at all, if they had been aware that the market prices had been falsely inflated by the Defendants' misleading statements.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the ATP common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act by all Defendants

73.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

74.     The Defendants acted as controlling persons of ATP within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of ATP, the Defendants had the power and authority to cause ATP to engage in the wrongful conduct complained of herein.

75.     By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Granting such other and further relief as deemed appropriate by the Court.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: August 5, 2013

/s/ William B. Federman
William B. Federman
TBA #00794935
SD TX Bar #21540
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

-and-

2926 Maple Ave., Suite 200
Dallas, TX  75201

*Attorney-in-Charge for Plaintiff*

36

**Plaintiff's Certification of Investment of
ATP Oil and Gas, Inc.**

I, _Brian M. Neiman_, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.    If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary). I am willing to participate on an executive committee of shareholders.

3.    Plaintiff's transaction in ATPG security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF SECURITY (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 36023 | 8/2/11 | 15.02 | " | | | |
| 340o | 8/4/11 | 11.17 | " | | | |
| 3250 | 4/24/11 | 4.11 | " | | | |
| 75 | 5/18/12 | 5.18 | " | | | |
| 12420 | 6/12/12 | 4.83 | " | | | |
| 2046 | 7/24/12 | 2.39 | " | | | |
| | | | | | | |
| 76084 | | 9.48 | | | | |

4.    I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.    During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.    I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this _21_ day of _June_, 2013.

Signature _____

_Brian M. Neiman_

Printed Name



**Plaintiff's Certification of Investment of
ATP Oil and Gas, Inc.**

I, BRIAN M. NEIMAN , hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.      If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary).  I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transaction in ATPG security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF SECURITY (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 4470 | 4/30/-9 | 7.27 | | | | |
| 7581 | 8/25/-9 | 11.00 | " | | | |
| 2318 | 5/7/10 | 14.97 | " | | | |
| 2783 | 4/14/11 | 16.39 | " | | | |
| 4972 | 4/18/12 | 6.39 | " | | | |
| 1300 | 4/18/12 | 6.38 | " | | | |
| | | | | | | |
| 23 624 | | 10.08 | | | | |
| | | | | | | |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this 21 day of June , 2013.

_____
Signature

BRIAN M. NEIMAN

Printed Name